1
2
3
4
5
6
7
8
9
10
11
12

```
FILED
CLERK, U.S. DISTRICT COURT

JUL 1 7 2009

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY
```

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TELEVISA, S.A. de C.V. and GRUPO TELEVISA, S,A., <br><br> Plaintiffs, <br><br> v. <br><br> UNIVISION COMMUNICATIONS INC., <br><br> Defendant. | Case No. CV 05-3444 PSG (MANx) <br><br> **POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING COURT TRIAL** |
| UNIVISION COMMUNICATIONS INC. and TELEFUTURA NETWORK, <br><br> Counterclaimants, <br><br> v. <br><br> TELEVISA, S.A. de C.V. and GRUPO TELEVISA, S.A., <br><br> Counterdefendants. | |

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

From June 9, 2009 to June 12, 2009, the Court heard evidence at a bench trial on whether Televisa is prohibited from making Programs, as that term is defined in the Program License Agreement ("PLA"), available to viewers in the United States via the Internet. A total of 14 witnesses testified live or by video, and 49 exhibits were admitted into evidence. Based on the record developed at trial, the Court makes the following findings of facts and conclusions of law:

## I.   FINDINGS OF FACT

### A.   The Parties

1.   Univision is the leading Spanish-language television broadcaster in the United States, with operations including the Univision, Galavision, and Telefutura television networks. The Univision network is the nation's most-watched Spanish-language broadcast television network, reaching (in 1996) 92% of Hispanic television households in the United States. Ex. 402A at 3.

2.   Televisa is the largest broadcaster in Mexico and distributes Spanish-language entertainment to 65 countries throughout the world. Perenchio, Vol. 3, 14:17-21[1]; De Angoitia, 6/11/09 a.m., 89:9-17.

### B.   The Purchase of Univision from Hallmark

3.   Prior to 1992, Univision was a Spanish-language network owned primarily by Hallmark Cards. Rader, 6/09/09 a.m., 12:3-15. Televisa co-owned Univision with Hallmark. Televisa owned 15 percent of the company; Hallmark owned 85 percent. Ex. 1113A at 4.

4.   In 1991, Jerry Perenchio, Emilio Azcarraga Milmo, and Gustavo Cisneros joined forces to purchase Univision from Hallmark. Perenchio, Vol. 3, 22:3-6; 23:24-24:8; 25:2-9.

5.   In 1992, Jerry Perenchio had over 19 years of experience in the television production business and owned a company called Chartwell Partners.

---

[1] All citations to Perenchio are found in Exhibit A to the Stipulation Regarding Depositions Played at Internet Trial.

1   Perenchio, Vol. 3, 10:12-16; Rader, 6/09/09 a.m., 11:21-23.

2       6.    Emilio Azcarraga Milmo was the Chief Executive Officer and a major

3   shareholder of Televisa. Perenchio, Vol. 3, 14:8-16.

4       7.    The entities formed by Perenchio, Televisa and Venevision purchased

5   the Univision network and stations for $550 million. The partners each put up

6   approximately $33 million, collectively $100 million, in the form of equity, and

7   raised $450 million in a combination of different types of debt securities. Rader,

8   6/09/09 a.m., 16:10-16.

9       8.    To comply with the Federal Communications Commission's rules

10  regarding foreign ownership of television stations, Perenchio assumed control of

11  the new venture. Although each party had put in one-third of the equity required

12  for the purchase, Perenchio was given ownership of 50 percent of the Univision

13  Network and 75 percent of the stations, with the remaining shares divided between

14  Televisa and Venevision. Ex. 1113A at 5; Davila, 6/11/09 p.m., 14:4-8.

15      9.    Televisa viewed Perenchio as the "ideal partner" because he was well

16  thought of in the investment and broadcasting communities, had experience with

17  the FCC and was sophisticated. Dam, 6/10/09 a.m., 5:11-6:5. Perenchio was also

18  a visionary. Dam, 6/10/09 a.m., 55:21-22.

19      10.   Perenchio also received a $50 million cap on his overall investment.

20  Thus, while Televisa and Venevision remained open to the potential of having to

21  re-pay $400 million in bank debt, Perenchio's obligation for additional capital was

22  limited to only $16.67 million on top of the original $33.3 million investment.

23  Davila, 6/11/09 p.m., 12:9-15.

24      11.   Before they acquired Univision, Perenchio, Televisa, and Venevision

25  negotiated the principal terms of their relationship. Perenchio, Vol. 3, 25:2-15.

26  Lawrence Dam and Jaime Davila were Televisa's principal negotiators. Davila,

27  6/11/09 p.m., 54:9-11. Stephen Rader, Chief Financial Officer of Chartwell

28

Partners, represented Perenchio. Rader, 6/09/09 a.m., 11:24–12:2; 13:10-17.

12.     Televisa would contribute one half of the expense for jointly produced programs in the United States with Univision. *Id.* at 13:1-7. In early discussions, the parties agreed that Televisa and Venevision would grant Univision an exclusive license to broadcast their programs in the United States for a period of 25 years. Perenchio, Vol. 3, 26:3-7. In exchange, Univision agreed to pay Televisa and Venevision a flat percentage of revenues on all of its advertising sales (with certain exceptions, and subject to certain caps), not just on advertising sales during programs supplied by Televisa or Venevision. Perenchio, Vol. 3, 26:23-27:2. The royalties Univision would pay to Televisa and Venevision combined were capped at 15%, a substantial discount from then-prevailing market rates. *Id.* at 12:16-23. *See also* Rader, 6/09/09 a.m., 14:4 (explaining that a premise of the partnership was acquiring Televisa's Programs "at very low cost"). Both Televisa and Perenchio understood that Perenchio was taking a big risk by agreeing to pay royalties on Univision's combined time sales for 25 years. Even if Univision used no Televisa programming in the future, it would still be forced to pay Televisa a substantial share of all of its revenues. Ex. 1113A at 7.

13.     Moreover, in order to permit Univision to grow its capital base and re-pay the banks, Televisa and Venevision agreed to defer payment of the royalties to which they would be entitled. Ex. 1113A at 15-16; Rader, 6/09/09 p.m., 10:13-25; Davila, 6/11/09 p.m., 18:21-19:6. Satisfaction of the conditions under which Univision would eventually pay those royalties were subject to Perenchio's discretion. Davila, 6/11/09 p.m. 13:14-19; *see also* Ex. 317; § 3.1.

14.     From the beginning of the deal, Chartwell made plain that neither Televisa nor Venevision would be able to broadcast in the United States any of the programs that Univision would license. Rader, 6/09/09 a.m., 17:25-18:13. During the negotiations, Perenchio was concerned that, after Univision had pledged itself

FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. CV 05-3444 PSG (MANx)

to Televisa by promising a percentage of its revenues for 25 years, Televisa "would be tempted to cheat on it in such a way that Univision would find itself competing against others broadcasting Televisa programs." Ex. 1113A at 7-8. Perenchio told Televisa that he knew that Televisa had tried to compete against Univision when Hallmark owned a majority of it, and Televisa owned a minority, via a competing U.S. network called Galavision. Ex. 1113A at 4. In order that Televisa not be in a position to compete against Univision, Perenchio insisted that Televisa sell Galavision to Univision. Ex. 1113A at 6; Rader, 6/09/09 a.m., 14:7-14. Perenchio wanted to make sure that neither Televisa nor Venevision could use any of their programs to compete with Univision while Univision owned the network. Rader, 6/09/09, 15:14-16:1.

15.     Perenchio insisted that, if Televisa was to receive a percentage of Univision's revenues regardless whether Univision used Televisa's programming, "Televisa had to grant Univision as close to an 'exclusive' on its programming as the U.S. government would allow[.]" Ex. 1113A at 8. By 1992, the parties knew that, before the 25-year agreement expired in 2017, broadcast television "would probably be replaced by satellite, digital and other new technologies." Ex. 1113A at 9.

16.     Televisa believed that the royalty arrangement agreed to by the parties was "overwhelmingly better for Televisa" than if royalties were calculated based on a percentage of advertising sales only within Televisa-supplied Programs. Ex. 1113A at 6-7. In return for receiving a percentage of Univision's sales, Televisa was willing to "give Univision the 'exclusive right' to all of its programs . . . ." Ex. 1113A at 8.

17.     In the negotiations, Perenchio and Televisa agreed that Univision's exclusivity extended to all forms of broadcasting presently known, as well as any new types of broadcasting technology that came into effect during the 25-year

period.  Perenchio, Vol. 3, 28:5-10.

18.     In their earliest negotiations, Televisa's representative pointed out that Televisa did not want to violate Univision's exclusive license as a result of programs from Mexico being viewed by homes on the U.S./Mexico border.  Rader, 6/09/09 a.m., 19:4-16.  Perenchio knew that Televisa used a satellite to deliver its programs to its border stations in Mexico and agreed to allow for spillover into the United States.  Perenchio, Vol. 3, 56:21; 56:24-57:10.

## C.     The 1992 Agreements

### 1.     The Network Agreement

19.     When they agreed to acquire Univision, Perenchio, Televisa, and Venevision entered into an agreement called the Network Agreement, dated April 7, 1992.  Ex. 178.

20.     The Network Agreement established that Univision would have the exclusive use of Televisa's programming for 25 years.  Section 4.1 provided:

> For 25 years following the Closing, Televisa and Venevision and their controlled affiliates will each offer the Venture **the right to exploit in the United States all rights that they have in all of their programming in the Spanish language or with Spanish subtitles for which they have rights in any part of the United States,** and will offer such right to the Venture before such right is offered to anyone else.  Any programming that is declined by the Venture may then be offered to others in the United States, subject to a right of first refusal of the Venture if someone else wishes to accept such offer.

Ex. 178, § 4.1 (emphasis added).  This paragraph evolved into the PLA's concept of Accepted Programs.  Dam, 6/10/09 a.m., 51:8-17.

21.     The Network Agreement also originally established the parties' royalty arrangement.  Section 4.1.3 provided:

> The Venture will pay to Televisa and Venevision a royalty in cash for the programs offered to it in an aggregate amount equal to 15% of the combined net time sales including barter and trade (i.e., time sales, including barter and trade, less advertising commissions, special

5

event revenue, music license fees and outside affiliate compensation) of the Stations, the Phoenix Station and the Venture, calculated in accordance with generally accepted accounting principles ("GAAP") in each of the first twenty-five years following the Closing ("the Program Royalty").

Ex. 178, § 4.1.3.

## 2.    The Program License Agreement

22.    On September 14, 1992, O'Melveny & Myers sent a draft PLA to the Justice Department for the Antitrust Division's approval. Ex. 1600. The Antitrust Division wanted to ensure that Univision's rights did not cover more Televisa programming than Univision needed. Dam, 6/09/09 p.m., 94:16-20. The cover letter fully described the ways in which Televisa's programs would be available to others. Ex. 1600. It made no mention whatsoever of Televisa's having the right to broadcast from Mexico to the United States by satellite the programs that Univision was licensing. *Id.*

23.    The Program License Agreement ("PLA"), dated December 17, 1992, defined the parties' rights and obligations as licensee and licensors. Ex. 169. Either Televisa or Televisa's lawyers drafted the original PLA. Haymer, 6/10/09 a.m., 76:5-8.

24.    Section 1.1 of the PLA granted Univision, for a period of 25 years, "the option to obtain an exclusive license for the broadcast over [its networks] in the [United States] of all Programs . . . ." Ex. 169, § 1.1.

25.    Section 1.1(a) granted Univision the exclusive right to broadcast Televisa Programs on a right-of-first-refusal basis. If Univision declined a Program, Televisa then would be free to offer U.S. rights in that program to someone else, with certain restrictions and for a limited period. Ex. 169, § 1.1(a)-(c).

26.    Section 7.1(g) of the 1992 PLA provided that, "[e]xcept to the extent expressly permitted by [the PLA]," Televisa "will not grant or license to others,

and will not itself exercise, any rights to broadcast the Accepted Programs in or to the [United States]." Ex. 169, § 7.1(g).

27.   Without Televisa's promise in section 7.1(g), Univision would not have gone forward with the purchase of Univision.  Rader, 6/09/09 a.m., 29:24-30:7.  Rader understood that section 7.1(g) of the PLA would forbid Televisa from competing with Univision with respect to Accepted Programs.  Rader, 6/09/09 a.m., 30:8-12.

28.   In addition, Section 2 of the 1992 PLA provided that, "[s]ubject to the terms and conditions set forth herein, [Univision] shall have exclusivity in the carriage of all accepted Programs ("Accepted Programs") for broadcast in the [United States] from the date of acceptance to the conclusion of the applicable Broadcast Period."  Ex. 169, § 2.

29.   The PLA defined the word "broadcast" used in the foregoing provisions expansively, to include

> all electronic forms or other means now known or hereafter developed of transmission and re-transmission, including but not limited to over-the-air television, cable television, low power television, multi-point distribution systems, wire, fiber optics, microwave, and satellite . . . .

Ex. 169, §1.2(b).

30.   The PLA defined "Programs" to include, among other things, all Spanish-language programs produced by third parties or co-produced by Televisa to which Televisa owned "sole distribution rights in the [United States]."  Ex. 169, § 1.2(a).

31.   In exchange for the exclusive right to broadcast Televisa's Programs in the United States, Univision agreed to pay royalties to Televisa on all of Univision's advertising sales (with certain exceptions and subject to certain caps), not just on advertising sales during Televisa Programs.  Ex. 169, § 5.

32.   Section 1.3 of the PLA addressed the issue of "spillover," which is the

FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. CV 05-3444 PSG (MANx)

incidental and generally unavoidable overflow of electronic signals from one geographical territory into another. Ex. 169, § 1.3; Madoff, 6/11/09 a.m., 9:23-10:1.

33.    Section 1.3 provided:

> [Televisa] and its affiliates shall have the right and ability to, and to permit others to: (i) transmit or retransmit in any electronic form or other means, from any television station in Mexico, or via satellite which receives its signal from any earth station or other facility in Mexico, any Programs which may also be covered by this Agreement, notwithstanding the fact that such transmissions or re-transmissions may be viewed in the [United States], provided that neither [Televisa] nor its affiliates consent to the retransmission of such Programs by any television station in the [United States] or by any cable system in the [United States] that is located beyond 35 miles from the community of license of any transmitting television station in Mexico transmitting the Programs (any such cable re-transmission within such 35 mile limit being hereby expressly permitted); and (ii) market and promote and otherwise generate revenues (including, but not limited to, the sale of advertising time) attributable to the ability of viewers in the [United States] to receive such Programs.

Ex. 169, § 1.3.

34.    Section 1.3 is typical of spillover provisions used in the industry, and was intended to permit Televisa to transmit and re-transmit Programs from television stations in Mexico, or via satellite which receives its signal from a facility in Mexico, even though those transmissions or re-transmissions would be incidentally viewed in the United States. Section 1.3 also restricts any re-transmission of those Programs in the United States by any television stations or cable systems located more than 35 miles from the Mexican station transmitting the Programs. Ex. 169, § 1.3; Madoff, 6/11/09 a.m., 11:10-11; 12:24-14:24.

35.    Both parties agree that Section 1.3 is a spillover provision. Univision's witnesses understood that it was solely a spillover provision. Perenchio, Vol. 3, 56:8-15; 56:18-21; 56:24-57:10; Rader, 6/09/09 a.m., 62:10-14; Haymer, 6/10/09 p.m., 4:11-15; Petroni, 6/10/09 p.m., 90:22-91:2; Madoff, 6/11/09

1    a.m., 34:2-6.  Televisa's witnesses admitted that section 1.3 was at least in part a

2    spillover provision.  Dam, 6/09/09 p.m., 112:13-19; Stipulation Regarding

3    Depositions, Ex. B (Neuburger, 119:25-121:13); Davila, 6/11/09 p.m., 11:15-17.

4         36.    During the 1992 negotiations, no one from Televisa ever said that they

5    understood section 1.3 to give Televisa rights beyond spillover.  Rader, 6/09/09

6    a.m., 68:11-16; Petroni, 6/10/09 p.m., 90:22-91:15; Davila, 6/11/09 p.m., 27:21-

7    28:2 (testifying that he had no recollection of discussing section 1.3 with any

8    Perenchio negotiators before signing the 1992 agreements).  Davila did not even

9    recall section 1.3 being raised as an issue.  Davila, 6/11/09 p.m., 28:3-7.

10   **D.    By 1996, the Parties Disputed the Meaning of PLA Section 1.3**

11        37.    On May 12, 1995, Perenchio and Dam met after Dam had met with

12   Azcarraga Milmo.  At that time, Azcarraga Milmo wanted "some narrow-ability to

13   compete in cable casting and DBS."  Ex. 8229.  In 1995, Dam also wrote a

14   proposal seeking to eliminate "DTH from program exclusivity" in the PLA.  Ex.

15   3565 at 3; Dam, 6/09/09 p.m., 78:1-22.  DTH (direct to home satellite) and DBS

16   (direct broadcast satellite) were essentially the same thing.  Dam, 6/9/09 p.m.,

17   83:1-4.

18        38.    In the 1995-96 time frame, Univision for the first time learned that

19   Televisa was claiming the right to broadcast its Programs that Univision had

20   licensed via satellite to viewers in the United States.  Rader, 6/09/09 a.m., 32:14-

21   23; Haymer, 6/10/09 a.m., 79:19-80:2.

22        39.    On March 1, 1996, Rader, on behalf of Univision, sent to Televisa an

23   amended draft PLA that included changes to section 1.3, which were intended "to

24   clarify what [Univision] believe[s] this provision was intended to cover, that is,

25   satellite networking of television stations and the related border spillover."  Ex.

26   175 at U-391825.

27        40.    Haymer drafted the revised language to section 1.3 to clarify the way

28

1  Televisa's signals were delivered to its stations on the Mexican border so that the

2  spillover language in section 1.3 would reflect how Televisa's spillover actually

3  worked.  Haymer understood that Televisa beamed its signals up to a low power

4  satellite and then down to its border stations.  Haymer, 6/10/09 a.m., 80:8-81:16.

5      41.    Instead of making Univision's proposed revisions to section 1.3, the

6  parties agreed to disagree about section 1.3's meaning.  Haymer, 6/10/09 a.m.,

7  84:10-15.

8      42.    In the September 26, 1996 prospectus for Univision's public stock

9  offering, Univision disclosed to its investors that "Televisa asserts that the terms

10  and conditions of its Program License Agreement with Univision allow it, under

11  certain circumstances, to provide any DBS [satellite] venture uplinking in Mexico

12  for distribution in the United States with Televisa program services which contain

13  programs to which Univision believes it has an exclusive first option in the United

14  States." Ex. 402A at 8-9.  Univision further noted that "Univision disagrees with

15  Televisa's assertion and has notified Televisa of its intention to enforce its rights

16  by all appropriate means including, if necessary, legal action, if Televisa provides

17  such programs to any such DBS venture." Id. at 9.

18  **E.    The 1996 Agreements**

19      **1.    The PLA**

20      43.    On October 1, 1996, the parties amended the PLA.  Ex. 177.

21      44.    The amended 1996 PLA retained the same structure as the 1992 PLA.

22  It continued to grant Univision the exclusive license, on a right-of-first-refusal

23  basis, to broadcast Televisa Programs in the United States. Ex. 177, § 1.1.

24      45.    "Broadcast" was defined in the same manner, to include "all

25  electronic forms or other means now known or hereafter developed of transmission

26  and re-transmission." Ex. 177, § 1.2(b).

27      46.    Section 2 again provided that, "[s]ubject to the terms and conditions

28

10

1  set forth herein, [Univision] shall have exclusivity in the carriage of all accepted

2  Programs ("Accepted Programs") for broadcast in the [United States] from the date

3  of acceptance to the conclusion of the applicable Broadcast Period." Ex. 177, § 2.

4       47.    As with the 1992 PLA, in section 7.1(g) Televisa represented and

5  warranted to Univision that, unless "expressly permitted" in the PLA, Televisa

6  would not "grant or license to others, and will not itself exercise, any rights to

7  broadcast the Accepted Programs in or to the [United States]." Ex. 177, § 7.1(g).

8       48.    Because of the dispute over the interpretation of section 1.3, the

9  parties agreed to disagree about the meaning of section 1.3 and retained the same

10 language in section 1.3 in the 1996 PLA that they had used in the 1992 PLA.

11 Haymer, 6/10/09 a.m., 84:10-15.

12 **F.    The 2001 PLA**

13      49.    In 2001, the parties again amended the PLA.  Ex. 11.  As with the

14 1992 and 1996 PLAs, the 2001 PLA distinguishes between what Univision is

15 permitted to do under the PLA, which is not at issue here, and what Televisa

16 promised not to do. *Id.*

17      50.    The 2001 PLA expanded Univision's "exclusive license to broadcast"

18 in the United States to "all Programs throughout the Term" on the Univision

19 Network and the Galavision Network, and also added the Telefutura Network.  Ex.

20 11, § 1.1(a).

21      51.    Unlike the arrangement in the previous PLAs, Univision no longer

22 needed to exercise any option to obtain the exclusive right to broadcast Programs;

23 Univision was granted the exclusive rights to broadcast "all Programs." Ex. 11, §

24 1.1(a).

25      52.    As in the previous PLAs, Televisa represented and warranted to

26 Univision that, unless "expressly permitted" by the PLA, Televisa would not

27 "grant or license to others, and will not itself exercise, any rights to broadcast any

28

1    Program in or to the [United States] . . . ." Ex. 11, § 6.1(g).

2        53.    Section 6.1(g) is commonly called a holdback provision and is

3    customarily part of the representations and warranties of a license agreement.

4    Madoff, 6/11/09 a.m., 53:14-18. It is an exception to the maxim that that which is

5    not granted is retained by the licensor. *Id.*, 23:19-25.

6        54.    The parties retained the same expansive definition of "broadcast" that

7    was in the previous PLAs. The PLA defined "broadcast" to include "all electronic

8    forms or other means now known or hereafter developed of transmission and re-

9    transmission, including but not limited to over-the-air-television, cable television,

10   low power television, multi-point distribution systems, wire, fiber optics,

11   microwave, and satellite . . . ." Ex. 11, § 1.2(e).

12       55.    Televisa concedes that the definition of broadcast includes the

13   internet. Azcarraga, 6/10/09 p.m., 106:22-107:2.

14       56.    When the parties amended the PLA in 2001, their dispute over

15   Televisa's internet rights had already crystallized. Ex. 11, § 24(d).

16       57.    Section 24 of the 2001 PLA provided, with some minor exceptions,

17   that for a period of five years, neither Televisa nor Univision could broadcast or

18   permit others to broadcast "Programs covered by [the PLA]" over the internet. Ex.

19   11, § 24(a).

20       58.    Section 24 further provided that, at the end of the five-year period,

21   "for the purposes of determining the rights of [Televisa] and its Affiliates with

22   respect to the Internet, Section 1.3 of this Agreement shall revert to the provisions

23   of Section 1.3 as in effect immediately prior to the date hereof." Ex. 11, § 24(d).

24       59.    Section 1.3 of the 1996 PLA, which is identical to section 1.3 of the

25   1992 PLA, replaced section 1.3 of the 2001 PLA on December 19, 2006. Ex. 11,

26   Ex. A; Haymer, 6/10/09 a.m., 108:9-14.

27       60.    The 2001 PLA acknowledged that the parties "disagree[d] as to the

28

1  rights of [Televisa] and its Affiliates under Section 1.3" of the 1996 PLA.  Ex. 11,

2  § 24(d).

## II.   CONCLUSIONS OF LAW

4      1.      "The fundamental goal of contractual interpretation is to give effect to

5  the mutual intention of the parties."  *People v. Shelton*, 37 Cal. 4th 759, 767, 37

6  Cal. Rptr. 3d 354 (2006) (citing Cal. Civ. Code § 1636).  The parties' mutual

7  intention is determined by objective manifestations of that intent, including the

8  words of the contract, as well as the surrounding circumstances to the negotiation

9  of the contract, and the object, nature and subject matter of the contract.  *Id.*

**A.   The plain language of the 2001 PLA bars Televisa from transmitting Programs licensed to Univision to the U.S. via the Internet.**

12     2.      Under California law, when the language of a contract is clear and

13 explicit, it governs.  *See* Cal. Civ. Code § 1638; *Shelton*, 37 Cal. 4th at 767; *Carr*

14 *Bus. Enters., Inc. v. City of Chowchilla*, 166 Cal. App. 4th 25, 30, 82 Cal. Rptr. 3d,

15 135 (2008).

16     3.      Section 1.1(a) grants Univision the "exclusive license to broadcast" in

17 the United States "all Programs throughout the Term on the Univision Network,

18 the Galavision Network, and the Telefutura Network."  Ex. 11, § 1.1(a).

19     4.      Section 6.1(g) prohibits Televisa from exercising itself, or licensing to

20 anyone, "any rights to broadcast any Program in or to the Territory" unless

21 "expressly permitted" by the PLA.  Ex. 11, § 6.1(g).  The grant of exclusivity in

22 section 6.1(g) is extremely broad and includes all forms of broadcast.

23     5.      "Broadcast" is defined expansively to mean "all electronic forms or

24 other means now known or hereafter developed of transmission and re-

25 transmission . . . ."  Ex. 11, § 1.2(e).  The Internet is a "means . . . of transmission

26 and retransmission."  The broad definition of "broadcast" encompasses

27 transmission over the Internet.  The phrase "to the Territory" specifically bars

28 broadcasting from Mexico to the United States.

6.    Televisa contends that section 1.3 of the PLA expressly permits Televisa to make Programs available to U.S. viewers via the Internet.  The Court disagrees.

7.    All parties admit that section 1.3 deals with spillover.  The question then for the Court is whether the parties expressly granted affirmative rights to Televisa that were commingled with spillover rights.

8.    The Court finds that section 1.3 gives Televisa limited rights that make sense only in the context of spillover.  First, it permits Televisa to transmit Programs only from television stations in Mexico or via satellite that receives its signal from a facility in Mexico.  *See* Exs. 11, A.  If section 1.3 had been an affirmative grant of rights, it would not have mattered where the signal originated. Second, it contains language qualifying the first part of the sentence and thus acknowledging that there may be an incidental overflow of signals coming from Mexico into the United States despite the exclusivity grant.  Third, it bars re-transmission of those Programs in the United States by television stations and cable systems located more than 35 miles from the Mexican station transmitting the Programs.  *Id.*  If section 1.3 were intended to permit Televisa to compete against Univision in the United States by satellite or other means outside conventional broadcast and cable—as Televisa contends—there would be no logical reason to impose these limitations.

**B.    Construing section 1.3 as a spillover provision conforms to the PLA's purpose—to grant Univision as close to an exclusive on Televisa's Programs as the U.S. government would allow**

9.    Under California law, a contract "must be construed so as to promote rather than defeat the common objectives of the parties, an interpretation which furthers these objectives is preferred and a contrary meaning inconsistent with the essential aim of the contract must be rejected."  *County of Marin v. Assessment Appeals Bd.*, 64 Cal. App. 3d 319, 328, 134 Cal. Rptr. 349 (1976).

10.     In *Brawner v. Wilson*, 126 Cal. App. 2d 381, 384, 271 P. 2d 937 (1954), the court stated, "the language of a contract governs the interpretation only so far as it is clear and explicit and does not involve an absurdity.  Language involving an absurdity is rejected, and so is any phrase or clause which is inconsistent with the object and intention of the parties." *Id.* at 384-85 (emphasis in original).

11.     In construing a contract, "the duty of the court is first to attain an understanding of the purpose and object of the writing, and next to give to that purpose and object the fullest effect compatible with the meaning of the language through which that purpose and object find expression." *Bradner v. Vasquez*, 102 Cal. App. 2d 338, 342, 227 P. 2d 559 (1951).  "Particular clauses of a contract are subordinate to its general intent."  Cal. Civ. Code § 1650.

12.     The trial testimony and evidence demonstrated that the PLA's purpose and object was for Univision to receive a 25-year grant of exclusivity in the United States to Televisa's Programs in exchange for Televisa's receiving royalties on advertising sales for nearly all of Univision's programming.  From 1992 to 2001, the exclusivity was expressed as a right of first refusal, which Televisa described as follows: "[A]s a practical matter, those programs left over for third parties would be only those which had little commercial appeal and those in which Univision had no interest in broadcasting."  Ex. 1113A, p. 8.  The 2001 PLA expanded Univision's grant of exclusivity to "all Programs."  Ex. 11, § 1.1(a).

13.     For Televisa's part, it "wanted to create every incentive and every need for [Univision] to actually run" Televisa's Programs.  Davila, 6/11/09 p.m., 59:23-60:5.

14.     Perenchio insisted on Televisa's selling Galavision to Univision in order to protect Univision from any Televisa "cheat[ing]"—an objective documented by Televisa's negotiator, Dam.  *See* Exs. 1113A pp 7-8 and 433.

15.     Dam created his memorandum, dated January 28, 1998 (Ex. 1113A), in order to provide Televisa's new management with an understanding of the relationship between Televisa and Univision respecting the PLAs, including his legal opinions about specific terms of the PLAs.  Dam, 6/09/2009 p.m., 55:8-25.

16.     According to Dam, the provisions in the PLA "are best understood as being designed to give Univision as close to an exclusive as the U.S. government would allow."  Ex. 433 at TVS00000382.  In 1992, the U.S. government approved the PLA with then section 7(g), which prohibited Televisa from exercising any rights to broadcast Accepted Programs in or to the United States.

17.     Having ascertained the PLA's purpose, the Court will interpret the PLA in light of it. *Bradner*, 102 Cal. App. 2d at 342.

18.     The Court finds that section 6.1(g) bars Televisa from broadcasting Programs, as the term is defined in the PLA, to the United States via the Internet. That interpretation accords with giving Univision as close to an exclusive as the U.S. government would allow.  It also accords with Televisa's purpose of giving Univision every incentive to run Televisa's Programs.

19.     Prior to entering into the 1992 PLA, Televisa never mentioned any claim to satellite rights or any other claimed right to beam Accepted Programs into the United States.  The Court rejects as not credible Dam's testimony that he told Petroni or Rader in December of 1992, or any time prior to the execution of the 1992 PLA, that section 1.3 permitted Televisa to engage in satellite broadcasting to the U.S.  The Court instead finds credible Rader's and Petroni's testimony that no one at Televisa ever said that section 1.3 was anything but a spillover provision.

20.     The Court also finds that Televisa's proffered interpretation turns the purpose and object of the PLA upside down.  Televisa has failed to explain adequately why Perenchio would have given Televisa the right to broadcast Programs by satellite into the United States, why the exclusivity granted in section

16

6.1(g) was so expansive if it was intended to be limited to television stations and cable systems, why the definition of broadcast in section 1.2(e) was so expansive if it only applied to television stations and cable systems, why transmitting by satellite into the U.S. the same Programs that Univision licensed would serve Televisa's purpose of giving Univision the incentive to run Televisa programming, why section 1.3 has all the traits of a spillover provision, and why Univision has satellite rights in the United States.

21.    Televisa's argument that a snippet of section 1.3, a one-sentence paragraph that Televisa itself drafted, "expressly permits" it to broadcast Programs from Mexico into the U.S. would result in an absurdity in light of the PLA's purpose. The law does not permit that result. *Brawner*, 126 Cal. App. 2d at 384. Univision's interpretation, on the other hand, accords with the purpose of the PLA.

**C.    Univision's interpretation respects the principle that a contract should be read as a whole so as to harmonize its various provisions.**

22.    "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641; *see also City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473, 80 Cal. Rptr. 2d 329 (1998) ("Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative, or meaningless.") (emphasis in original). Indeed, "[t]he problem is not what the separate parts of the contract may mean, but rather what the contract means as a whole, and the separate parts have little weight when compared with the contract in its entirety." *Hunt v. United Bank & Trust Co.*, 210 Cal. 108, 115, 291 P.2d 184 (1930).

23.    Univision's interpretation adheres to the above principle, while Televisa's violates it. In the PLA, Televisa promised that "[e]xcept to the extent expressly permitted by this Agreement, [it] has not and will not grant or license to

others, and will not itself exercise, any rights to broadcast any Program in or to the Territory. . ." Ex. 11 § 6.1(g). In light of the expansive definition of "broadcast," this promise bars Televisa from exercising any rights to broadcast Programs in or to the United States by any means of transmission. Indeed, Rader testified that Perenchio would not have done the deal without Televisa's promise in then section 7.1(g). Televisa concedes that, absent the introductory phrase ("[e]xcept to the extent expressly permitted by this Agreement"), it would have no argument that it has the right to broadcast Programs to the United States. The inquiry, therefore, turns to whether section 1.3 of the PLA "expressly permits" Televisa to broadcast Programs in or to the United States. The only thing section 1.3 expressly provides is spillover protection. Therefore, section 1.3 limits section 6.1(g) only by providing that, if Televisa's signal unavoidably spills over into the United States, Televisa will not be in violation of its promise to not broadcast Programs into the United States.

24.     In contrast, Televisa's PLA interpretation focuses on the first part of section 1.3, while ignoring both the rest of that section and other provisions in the PLA. As to section 1.3, Televisa ignores the fact that, if the object was to grant rights to Televisa, there was no reason to limit Televisa's alleged satellite (and later Internet rights) to a signal that originated from a station or other facility in Mexico—whereas it makes perfect sense to do so if it is simply a spillover provision. Similarly, it made no sense to state that Televisa has those rights, "notwithstanding the fact that such transmissions or re-transmissions may be viewed in the Territory" unless it is a spillover provision. It further made no sense in a grant of rights to restrict the re-transmission of Programs by a television station or cable station that is located more than 35 miles from the transmitting station in Mexico. That language makes sense only in the context of a typical spillover provision, not a grant of rights. Televisa misinterprets the restrictions

detailed in Section 1.3 as limiting Univision's rights to the transmission of Programs by television stations and cable stations.  However, the PLA's definition of broadcast specifically includes much more, including all means of transmission or re-transmission then known or later developed.  Nothing whatsoever in Univision's license grant in section 1.1 or in the exclusivity grant in section 6.1(g) (or earlier section 7.1(g)) restricted Univision's exclusive right to Programs to just cable systems or television stations.

25.   Thus, in order to harmonize all of the provisions in the PLA, the Court adopts Univision's interpretation and finds that section 6.1(g) bars Televisa from sending Programs to the United States by any means, including the Internet.

**D.   The custom and usage in the industry supports Univision's interpretation.**

26.   "Parties are presumed to contract pursuant to a fixed and established usage and custom of the trade or industry.  Contract terms must be interpreted according to any special meaning given to them by usage, and technical terms are interpreted as generally understood in the industry." *Southern Pac. Trans. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1244, 88 Cal. Rptr. 2d 777 (1999) (internal citations omitted).

27.   Section 1.3 consists of a single sentence that must be read as a whole. It includes language typical of spillover provisions commonly used in the industry. It allows Televisa to transmit Programs only from facilities in Mexico, and it allows re-transmission of those Programs in the United States only by cable systems located within 35 miles of a transmitting station in Mexico. Ex. 11, Ex. A. Such limitations are typical of spillover provisions, but would be atypical, and senseless, if section 1.3 were intended to give Televisa the right to compete against Univision in the United States by means other than conventional broadcast and cable.

28.   Section 1.3 also states that Televisa may transmit and re-transmit

Programs in limited ways, "notwithstanding the fact that such transmissions or re-transmissions may be viewed in the [United States] . . . ." Ex. 11, Ex. A. This language is intended to acknowledge that signals unavoidably may cross territorial borders and there may be some incidental overflow of signals from Mexico into the United States, despite Univision's exclusivity grant.

29.    Section 1.3's grant to Televisa of the right to generate revenues from the permitted spillover is also typical of spillover provisions. If section 1.3 had authorized Televisa to compete against Univision by alternate transmission means, as Televisa contends, the right to generate revenues would have been presumed.

30.    It is atypical to commingle a spillover provision with exceptions to a licensee's exclusivity, in other words, to read section 1.3 as Televisa does. As licensing expert, Steven Madoff, opined, limitations or carveouts to exclusivity are typically adjacent to the exclusivity grant. Here, after the grant of rights, there is a section with three pages of definitions, thereby indicating the end of the section that addresses the grant of rights.

31.    Accordingly, section 1.3 addresses spillover issues. It does not grant Televisa any affirmative rights to broadcast Programs to U.S. viewers via the Internet.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
CASE NO. CV 05-3444 PSG (MANx)

## III.  CONCLUSION

32.    Based upon the above findings of fact and conclusions of law, the Court finds that, under the 2001 PLA, Televisa is prohibited from making Programs, as that term is defined in the PLA, available to viewers in the United States via the Internet.  Plaintiffs are ordered to prepare and file a Proposed Judgment within 15 days from the entry of this order.

Dated:   7/17/09

PHILIP S. GUTIEREREZ
United States District Judge